**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**ALYSSA LEADER,**

**Plaintiff,**

**v.**

**PRESIDENT AND FELLOWS OF HARVARD COLLEGE,**

**Defendant.**

**Civil Action No. 16-10254**

**MEMORANDUM AND ORDER**

**CASPER, J.** **June 29, 2018**

## I. Introduction

Plaintiff Alyssa Leader ("Leader") brings claims against the President and Fellows of Harvard College ("Harvard") under Title VII, arising out of Harvard's response to conduct by another student, who will be identified as John Doe ("Doe"), towards Leader. Harvard moves for summary judgment on all of Leader's claims. D. 105. Harvard also moves to strike Leader's response to Harvard's motion. D. 132. For the following reasons, the Court DENIES Harvard's motion to strike Leader's response, D. 132, and ALLOWS Harvard's motion for summary judgment, D. 105.

## II. Factual Allegations

The following facts are undisputed unless otherwise noted.[1] Leader enrolled in Harvard College as an undergraduate student in 2011. D. 111 ¶ 1, D. 126 ¶ 1. From 2012 to 2015, Leader resided in Cabot House, an undergraduate residence. Id. Doe was also an undergraduate student at Harvard College who resided in Cabot House from 2012 to 2015. D. 111 ¶ 2; D. 126 ¶ 2. In 2014, both Leader and Doe worked at the Cabot Café on campus. D. 111 ¶¶ 2, 16; D. 126 ¶¶ 2, 16.

Leader reported that, between April 2013 and March 2014, Doe sexually violated Leader a series of times. D. 111 ¶ 9; D. 126 ¶ 9. Leader's last conversation with Doe took place in September 2014. D. 111 ¶ 10; D. 126 ¶ 10. Prior to November 2014, Leader shared her allegations regarding Doe with certified rape counselors at Harvard's Office of Sexual Assault Prevention and Response ("OSAPR"), with the understanding that those conversations would be confidential. D. 111 ¶¶ 8, 11; D. 126 ¶¶ 8, 11.

On November 5, 2014, Leader received an email from her advising administrator informing her that she was behind on meeting her deadline for her thesis prospectus and would receive an unsatisfactory grade in the course. D. 111 ¶ 12; D. 126 ¶ 12. On November 6, 2014, Leader informed Tiffanie Ting ("Ting"), her Resident Dean, of some of the details of Doe's conduct and the effect such conduct had on Leader's thesis work, without identifying Doe by name. D. 111 ¶ 14; D. 126 ¶ 14. Leader had not previously reported her allegations regarding Doe to any other non-confidential source at Harvard College. D. 111 ¶ 15; D. 126 ¶ 15. Ting asked Leader whether

[1] Harvard moves to strike certain portions of Leader's response to Harvard's statement of undisputed facts for failure to comply with Local Rule 56.1, on the grounds that Leader's response includes additional undisputed facts that are immaterial to the motion. D. 132. The Court takes note only of those facts that are material to the dispute and responsive to the motion for summary judgment. The Court, therefore, DENIES Harvard's motion to strike, D. 132.

she wanted to be moved to another residence, and Leader indicated that she did not want to do so. D. 111 ¶ 16; D. 126 ¶ 16. On that same day, Ting contacted Harvard College's Title IX Coordinator, Emily Miller ("Miller"), regarding Leader and Miller then emailed Leader to set up a meeting. D. 111 ¶¶ 19, 21; D. 126 ¶¶ 19, 21. The next day, on November 7, 2014, Leader and Miller had a meeting at which they discussed the possibility of having Harvard College's Administrative Board enter a "no-contact" order between Leader and Doe, the possibility of academic accommodations, the option of Leader moving to a different residence, and the option of Leader filing a complaint with Harvard's Office of Sexual and Gender-Based Dispute Resolution ("ODR"). D. 111 ¶¶ 23-27, 32; D. 126 ¶¶ 23-27, 32. During that conversation, Miller informed Leader that a no-contact order would not contain a provision requiring Doe to maintain a certain distance from Leader; that the no-contact order would be mutual and therefore could prohibit Leader from attending events that Doe was already attending; and that Doe would not be restricted from coming to the Cabot Café at which they both worked. D. 126 ¶ 34; D. 135 ¶ 34. On November 11, 2014, Miller sent a follow-up email to Leader providing further options regarding the tailoring of a no-contact order, such as setting up staggered times that Leader and Doe would be permitted to enter public spaces. D. 111 ¶¶ 30-31; D. 126 ¶¶ 30-31. On November 14, 2014, Leader responded to Miller's email indicating that she preferred not to pursue a no-contact order. D. 111 ¶ 33; D. 126 ¶ 33. Between November 14, 2014 and November 19, 2014, Leader informed her thesis advisors that she had been dealing with "interpersonal issues" and Leader received an extension on a thesis deadline. D. 111 ¶¶ 34, 36; D. 126 ¶¶ 34, 36. In December 2014, in the dining hall, Doe passed Leader's table and gave Leader a "glaring" look that upset her. D. 126 ¶ 39; D. 135 ¶ 39. On December 15, 2014, Leader emailed Miller to discuss a no-contact order again and the two planned to meet the next morning. D. 111 ¶ 38; D. 126 ¶ 38.

Leader then cancelled the meeting with Miller, indicating that she was not "as set on" getting the no-contact order as she had thought when she had emailed Miller the previous evening. D. 111 ¶ 39; D. 126 ¶ 39; D. 111-20 at 1.

On February 3, 2015, Leader filed a complaint with ODR against Doe. D. 111 ¶ 50; D. 126 ¶ 50. On February 6, 2015, Ilissa Povich, an ODR investigator, informed Leader that she could choose to have a personal advisor present to any interviews with the investigative team. D. 111 ¶ 52; D. 126 ¶ 52. Leader chose as her personal advisor Alyssa Green ("Green"), the Survivor Advocate at OSAPR. D. 111 ¶¶ 47, 52; D. 126 ¶¶ 47, 52. On February 12, 2015, the lead investigator from ODR, William McCants, interviewed Leader. D. 111 ¶¶ 47, 54; D. 126 ¶¶ 47, 54. On February 23, 2015, ODR officially opened the investigation and notified Doe of the investigation. D. 111 ¶ 55; D. 126 ¶ 55. On February 24, 2015, Miller and Leader again discussed the possibility of a no-contact order. D. 111 ¶ 57; D. 126 ¶ 57. On March 1, 2015, Leader declined the no-contact order. D. 111 ¶ 61; D. 126 ¶ 61. On March 5, 2015, Leader reported to Green that a friend of Doe's, A.J., had been "staring at [Leader] very intensely and to be very interested in what [Leader had] to say," and that A.J. may have been eavesdropping on her. D. 111 ¶ 64; D. 126 ¶ 64. On March 20, 2015, Leader reported to ODR "some possible harassment" by Doe's friends. D. 111 ¶ 65; D. 126 ¶ 65. She indicated that her "hope in contacting [ODR] was that you might be able to reach out to the respondent and let him know that that the behavior of his friends . . . [had made her] quite uncomfortabl[e]," but that she was "not concerned that this rises to the level of retaliation." D. 112-7. On March 27, 2015, ODR investigators questioned Doe regarding the incidents of harassment by Doe's friends. D. 111 ¶ 71; D. 126 ¶ 71.

On the evening of April 1, 2015, Leader contacted Detective Amy Zielinski of the Harvard University Police Department to inquire about getting a civil abuse prevention order against Doe,

and was informed that a restraining order would require Doe to move out of Cabot House. D. 111 ¶ 86; D. 126 ¶ 86. As of that time, it is uncontested that Doe himself had not been harassing Leader, although Doe was present in the common spaces of Cabot House. D. 111 ¶¶ 83, 106, 108; D. 126 ¶¶ 83, 106, 108. On April 12, 2015, Leader emailed Green to report that Doe and his friends were eating lunch on the deck outside the entryway to Leader's dorm, which frustrated Leader. D. 126 ¶ 47; D. 135 ¶ 47. On April 27, 2015, Leader met with Detective Zielinski to discuss Leader's options for obtaining an abuse prevention order. D. 111 ¶ 115; D. 126 ¶ 115. Leader, accompanied by Detective Zielinski, then applied for and was granted an abuse prevention order by the Cambridge District Court that would remain in place until May 7, 2015. D. 111 ¶ 117; D. 126 ¶ 117. That same day, Harvard College served Doe with the abuse prevention order and moved Doe out of Cabot House. D. 111 ¶ 118; D. 126 ¶ 118. On May 7, 2015, the Cambridge District Court held a hearing regarding whether to extend the abuse prevention order. D. 111 ¶ 127; D. 126 ¶ 127. At that hearing, Leader's attorney stated that Doe had continued to engage in harassment "into 2015" and that "recent harassment" included Doe coming to the café at which Leader worked and yelling her. D. 111 ¶ 129; D. 126 ¶ 129. Leader later testified at her deposition that Doe had not yelled at her at any point since Leader filed the ODR complaint. D. 111 ¶ 130; D. 126 ¶ 130. At the conclusion of the hearing, the Cambridge District Court extended the abuse prevention order until September 4, 2015. D. 111 ¶ 131; D. 126 ¶ 131. On May 17, 2015, Leader emailed Miller to inform Miller that Doe had disclosed to several people that Leader had filed an ODR report against him and that this disclosure had consequences on Leader's social life at the college. D. 126 ¶ 60; D. 135 ¶ 60.

In the meantime, the ODR investigation was continuing. On February 24, 2015, Doe requested a two-week extension to respond to the investigation, which he received. D. 111 ¶¶ 56,

58; D. 126 ¶¶ 56, 58. On March 16, 2015, Doe responded to the complaint with a witness list and exhibits. D. 111 ¶ 66; D. 126 ¶ 66. On March 23, 2015, ODR shared redacted versions of Doe's response and exhibits with Leader. D. 111 ¶ 67; D. 126 ¶ 67. On March 26, 2015, Leader submitted a witness list and certain exhibits to ODR. D. 111 ¶¶ 69-70; D. 126 ¶¶ 69-70. Between March 31, 2015 and April 13, 2015, ODR investigators interviewed sixteen witnesses, including all of Leader's proposed witnesses, and interviewed both Doe and Leader on multiple occasions. D. 111 ¶¶ 72-74; D. 126 ¶ 72-74. On April 10, 2015, Leader submitted additional documentary evidence to ODR, which included information regarding the purported harassment by Doe's friends. D. 111 ¶ 105; D. 126 ¶ 105.

On May 11, 2015, Leader submitted an additional complaint to ODR regarding what she alleged were Doe's continued harassment and intimidation directly and via third parties. D. 111 ¶ 135; D. 126 ¶ 135. On May 14, 2015, McCants notified Leader that ODR would also investigate the additional complaint and address in in its final report. D. 111 ¶ 137; D. 126 ¶ 137. Between May 20 and May 22, 2015, ODR interviewed three additional witnesses regarding the allegations in the additional complaint. D. 111 ¶ 141; D. 126 ¶ 141. On May 22, 2015, Leader submitted written materials to ODR regarding the allegations in the additional complaint. D. 111 ¶ 142; D. 126 ¶ 142. At some point in May 2015, Leader graduated from Harvard College, with her thesis complete. D. 111 ¶ 1; D. 126 ¶ 1.

On July 17, 2015, ODR issued its draft report finding that Doe had not violated Harvard policy and that Doe's friends had not violated Harvard policy as well. D. 111 ¶¶ 144-145; D. 126 ¶¶ 144-145. On July 20, 2015, Leader provided comments on the draft report. D. 111 ¶ 147. On July 27, 2015, ODR issued its final, 79-page report. D. 111 ¶ 148; D. 126 ¶ 148. Leader filed an appeal on July 31, 2015, which was denied on August 14, 2015. D. 111 ¶ 149; D. 126 ¶ 149. On

August 18, 2015, the Administrative Board issued its finding that there was no violation of Harvard College policy. D. 111 ¶ 150; D. 126 ¶ 150. Leader filed a request for reconsideration of that decision on August 24, 2015, which was denied on September 1, 2015. D. 111 ¶¶ 151-152.

During the course of the ODR investigation and adjudication, Doe was represented by Ruth O'Meara-Costello ("O'Meara-Costello"). D. 126 ¶ 67; D. 135 ¶ 67. Over the course of the investigation, O'Meara-Costello sent multiple letters to the General Counsel of Harvard, criticizing Harvard's investigation and arguing that Harvard may have violated the Title IX rights of Doe by mishandling the investigation. D. 126 ¶¶ 69-72; D. 135 ¶¶ 69-72.

In 2014 and 2015, public criticism of Harvard's policy regarding sexual misconduct came from both survivors of sexual assault and people concerned about the rights of those accused of sexual misconduct. D. 126 ¶¶ 17-20, 22-24; D. 135 ¶¶ 17-20, 22-24. On December 30, 2014, the Department of Education's Office of Civil Rights entered into a resolution agreement with Harvard in which Harvard agreed to make certain changes to its policies for responding to sexual misconduct. D. 126 ¶ 21; D. 135 ¶ 21.

**III. Procedural History**

On February 16, 2016, Leader filed her original complaint, D. 1, and amended it on July 5, 2016. D. 27. On March 17, 2017, the Court granted in part and denied in part Harvard's motion to dismiss, dismissing Count III (premises liability). D. 55. The Title IX count (Count I) and the negligence count (Count II) remain. D. 55. Harvard has now moved for summary judgment, D. 105, and to strike certain portions of Leader's response to its motion for summary judgment. D. 132. The Court heard argument from the parties on both motions and took the matter under advisement. D. 138.

## IV. Discussion

### A. Standard of Review

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is 'genuine' if the evidence of record permits a rational factfinder to resolve it in favor of either party." Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 4 (1st Cir. 2010). "A fact is 'material' if its existence or nonexistence has the potential to change the outcome of the suit." Id. at 5. "The moving party bears the initial burden of informing the trial court of the basis for his motion and identifying the portions of the pleadings, depositions, answers to interrogatories, admissions, and affidavits, if any, that demonstrate the absence of any genuine issue of material fact." Id. If the movant meets that burden, "the burden shifts to the nonmoving party, who must, with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor." Id.

### B. Title IX Claim

"Under Title IX of the Education Amendments of 1972, a recipient of funding from the United States Department of Education may be liable for damages if 'its deliberate indifference [to peer-on-peer sexual harassment] "subjects" its students to harassment.'" Porto v. Town of Tewksbury, 488 F.3d 67, 72 (1st Cir. 2007) (quoting Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 644 (1999) (alterations in original)). To make out such a claim, a plaintiff must show first, "that he or she was subject to 'severe, pervasive, and objectively offensive' sexual harassment by a school peer," second, "that the harassment caused the plaintiff to be deprived of educational opportunities or benefits," third, that the school "knew of the harassment," fourth, that the harassment occurred in the "programs or activities" of the school, and fifth, that the school was "deliberately indifferent to the harassment such that its response (or lack thereof) is clearly

unreasonable in light of the known circumstances." Id. at 72-73; see Doe v. Trustees of Boston Coll., 892 F.3d 67, slip op. at 49-50 (1st Cir. 2018) (stating that "[t]o succeed on a Title IX deliberate indifference claim, a plaintiff must show that an official with authority to implement corrective measures was aware of and deliberately indifferent to an act of discrimination on the basis of sex").

Harvard contends, in its motion for summary judgment, that the undisputed record shows that Leader cannot prove the fifth element: that Harvard acted with deliberate indifference to the harassment suffered by Leader. D. 110 at 18. Rather, it contends, the record shows that, as soon as Leader reported the harassment in a non-confidential setting, Leader met with Miller to discuss various options for proceeding and Leader made a choice to pursue some but not other options; that once Leader filed a formal complaint, Harvard initiated an investigation; that, upon receiving Leader's reports of ongoing harassment, Harvard expanded the investigation to include those allegations; and that the Harvard University Police Department assisted in Leader in obtaining an abuse prevention order.

Leader identifies several points at which she contends that Harvard's failure to act, or inappropriate action, rises to the level of deliberate indifference. First, she points to Harvard's failure to act between November 7, 2014, when Leader first reported Doe's conduct to Miller and February 12, 2015, after Leader filed her formal complaint. D. 125 at 16. The record, however, shows that Leader and Miller discussed a range of options, including filing a formal complaint with ODR, obtaining a no-contact order, moving to a different residence, and obtaining academic accommodations. D. 111 ¶¶ 23-26, 32; D. 126 ¶¶ 23-26, 32. Leader then opted for obtaining academic accommodations, D. 111 ¶¶ 34, 36; D. 126 ¶¶ 34, 36, but opted against pursuing any of the options laid out by Miller at that time. Thus, Harvard's failure to initiate an investigation was

not an unjustified delay, but was rather justified by Leader's choice not to file a complaint at the time. Harvard's conduct thus cannot be characterized as "clearly unreasonable in light of the known circumstances." Porto, 488 F.3d at 73.

Second, Leader contends that the ODR investigation was biased and inequitable because of the "blowback by Harvard law professors" and the "obvious looming threat of a lawsuit by Doe's lawyers." D. 125 at 17. However, Leader does not point to any specific conduct, or lack thereof, by Harvard that was biased or inequitable during the course of the ODR investigation.

Third, Leader argues that Harvard failed to provide reasonable protection to Leader pending the ODR investigation. D. 125 at 18. Specifically, she contends that Harvard failed to offer a "one-way no-contact order," that is, a no-contact order that would have required Doe to avoid Leader without requiring Leader to avoid Doe and that Harvard failed to move Doe out of Cabot House pending the investigation. D. 125 at 18-19. Harvard's failure to engage in "particular remedial demands," however, is not sufficient for a finding of liability under Title IX. Davis, 526 U.S. at 648. The Supreme Court in Davis emphasized that its reading of Title IX "does not mean that . . . administrators must engage in particular disciplinary action" because liability lies "only where the [institution's] response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." Id. Rather, so long as the school timely commenced an investigation – which it did, for the reasons described above – and took "suitable remedial measures," liability under Title IX may not lie. Fitzgerald v. Barnstable Sch. Comm., 504 F.3d 165, 174 (1st Cir. 2007), rev'd on other grounds, 555 U.S. 246 (2009). As did the school in Fitzgerald, Harvard provided Leader with a range of options, including removing herself from the shared house; although Leader, like the plaintiff in Fitzgerald, would have preferred that the putative harasser be required to move instead, Harvard's conduct does not rise to the level of deliberate indifference

because it did not provide that option. Fitzgerald, 504 F.3d at 174 n.6. Although Leader contends that Fitzgerald is not applicable because that case involved younger children, the increased age of the parties here does not change the underlying principle that a remedial measure to separate the plaintiff and putative assailant is not unsuitable merely because it would place the burden on the plaintiff rather than the putative assailant before a finding of fault by the putative assailant. Leader further argues that Harvard's remedial measures were not suitable because Leader experienced "harassment, intimidation, and retaliation from John Doe and his friends." D. 125 at 18. The record, however, shows that during the pendency of the ODR investigation, there were two incidents of purported harassment: on March 5, 2014, Doe's friend A.J. stared at Leader and purportedly eavesdropped on her, D. 111 ¶ 64, and on April 12, 2014, Doe and his friends ate lunch on the deck outside the entryway to Leader's dormitory. D. 126 ¶ 47. Both incidents occurred in public places and did not involve anyone speaking to or touching Leader. A reasonable factfinder could not conclude that, based on these incidents, the measures Harvard took were unreasonable.

Fourth, Leader contends that Harvard failed to inform Leader in a timely manner that she had the option of applying for a civil abuse prevention order. D. 125 at 19. But, as described above, Harvard did not violate Title IX by failing to provide Leader with a particular remedial measure, and the undisputed record shows that Harvard provided both a prompt investigation and suitable remedial measures.

Fifth, Leader argues that the outcome of the ODR proceeding was erroneous. D. 125 at 20. To succeed on an erroneous outcome claim, Leader "must offer evidence (1) that would 'cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding' and (2) show 'gender bias was a motivating factor.'" Trustees of Boston Coll., slip op. at 46 (quoting

Yusuf v. Vassar College, 35 F.3d 709, 715 (2d Cir. 1994)). The record, however, contains no facts from which a factfinder could plausibly conclude that the ODR proceeding was affected by gender bias.

Sixth, Leader contends that Harvard failed to comply with guidance documents promulgated by the Department of Education. D. 125 at 21. But, as this Court explained in its Memorandum and Order regarding the motion to dismiss, "Leader may not rest her theory of liability upon Harvard's failure to abide by those guidance documents . . . ." D. 55 at 15. Given that Leader's other theories for how Harvard acted with deliberate indifference to her situation do not survive, this noncompliance theory alone on this record is not sufficient to satisfy this claim either.

Seventh, Leader argues that Harvard maintained a "policy of indifference" towards sexual misconduct on campus, making it responsible even before it had actual knowledge of the misconduct. D. 125 at 22. Leader does not, however, point to any evidence in the record that Harvard maintained such a policy. Leader points to the public criticism of Harvard regarding its sexual assault policies, D. 125 at 23, but a reasonable factfinder could not infer from such criticism that Harvard maintained a policy of deliberate indifference.

**C. Negligence Claim**

"In any negligence case, a plaintiff must prove (1) a legal duty owed by defendant to plaintiff; (2) a breach of that duty; (3) proximate or legal cause; and (4) actual damage or injury." Doe v. Emerson Coll., 153 F. Supp. 3d 506, 514 (D. Mass. 2015). Leader contends that, under Massachusetts law, Harvard owed Leader a duty to protect Leader from the foreseeable harm of harassment pending the ODR investigation. D. 125 at 24. Harvard contends that it had no duty to protect Leader from the type of conduct that she identifies as retaliatory harassment. D. 110 at 24.

Under Massachusetts law, there is generally "no duty to protect others from the criminal or wrongful activities of third persons." Mullins v. Pine Manor Coll., 389 Mass. 47, 50 (1983); see Trustees of Boston Coll., slip op. at 46 (citing Mullins, 389 Mass. at 53). However, such a duty may exist where there is a "'special relationship' between the plaintiff and the defendant." Irwin v. Town of Ware, 392 Mass. 745, 756 (1984). In Mullins, the Supreme Judicial Court of Massachusetts held that "[c]olleges must [] act 'to use reasonable care to prevent injury' to their students 'by third persons whether their acts were accidental, negligent, or intentional.'" Mullins, 389 Mass. at 54 (quoting Carey v. New Yorker of Worcester, Inc., 355 Mass. 450, 452 (1969)). In determining whether a defendant has an obligation to protect the plaintiff from a particular type of harm from a third party, courts look "[f]oremost . . . [to] whether a defendant reasonably could foresee that he would be expected to take affirmative action to protect the plaintiff and could anticipate harm to the plaintiff from the failure to do so." Irwin, 392 Mass. at 756.

Even assuming that a college has the obligation to protect students from the non-criminal actions of third parties, a college does not have the obligation to protect a student from the specific conduct that Leader identifies here as retaliatory harassment. The specific conduct that the record shows occurred here during the pendency of the ODR proceedings – a stare combined with eavesdropping and the presence of Doe and others in a public space near Leader's dormitory – falls outside the scope of the type of harm that a university would have the duty to protect its students from. See Doe, 153 F. Supp. 3d at 514.

If such a duty did exist, there is no genuine dispute of fact regarding whether Harvard breached that duty. As explained above, Harvard offered Leader a range of options for protecting herself during the pendency of the ODR proceedings, including providing a no-contact order (and even a modification of that order to allow for staggered use of common spaces by Leader and Doe)

and offering to move Leader out of Cabot House. Leader points to no support in the record for the contention that Harvard's actions in providing Leader with these options fell below the standard of care for a reasonable university in this situation.

## V. Conclusion

For the foregoing reasons, the Court ALLOWS Harvard's motion for summary judgment, D. 105, and DENIES Harvard's motion to strike Leader's response, D. 132.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge